FELIX T. POPE *et al. v.* MERCHANTS' TRUST CO. *et al.*
IN RE E. R. CAUSEY *et al.*

and

IN RE D. L. SWAETMAN *et al.*

(*Jackson.* April Term, 1907.)

1. **CORPORATIONS.** Proof of signatures of corporators to amendment by any competent witness.

The signatures of the corporators on their application for amendment of the charter may be proved before the clerk of the county court by any witness who is competent to testify in court as to the matter involved, and interest in the charter applied for does not disqualify the witness. (*Post, pp.* 515, 516.)

Code cited and construed: Secs. 2542, 3712 (S); secs. 1989, 2850 (M. & V.); sec. 2038 (T & S. and 1858).

Acts cited and construed: Acts 1879, ch. 200.

Case cited and distinguished: Bank v. O'Brien, 94 Tenn., 38.

2. **SAME.** Same. Validity of amendment to charter cannot be attacked as defense to action on contract.

The subscriber for stock in a corporation when sued on his notes for stock issued under his contract of subscription shall not be permitted to set up as a defense the want of a legal organization based on the ground that the witness to the signatures of the corporators on their application for an amendment to the charter was incompetent. (*Post, pp.* 516, 517.)

Code cited and construed: Secs. 2031, 2064 (S.); sec. 1713 (M. & V.); sec. 1455 (T. & S. and 1858).

Case cited and distinguished: Railroad v. Sneed, 99 Tenn., 1.

3. **SAME.** Subscription to increase of capital stock is valid, though the whole amount is not taken.

The general principle or rule that a subscription to the original stock of a corporation is made upon the condition that the

Pope v. Trust Co.

whole amount of the capital stock is taken by *bona fide* subscribers, and that the subscribers will not be compelled to pay until this is done, does not apply to increased issues of stock. (*Post, pp.* 517-530.)

Acts cited and construed: Acts 1883, ch. 163.

Cases cited and distinguished:    Read v. Gas. Co., 9 Heisk., 546; Anderson v. Railroad, 91 Tenn., 44; Railroad v. Sneed, 99 Tenn., 7; Nutter v. Railroad, 6 Gray (Mass.), 87; Winters v. Armstrong (C. C.), 37 Fed., 508.

4. **SAME**.   Liability of subscribers for increased issue of stock is not dependent on debts against the corporation in liquidation. The liability of a subscriber for his subscription in the increased capitalization of a corporation is not dependent upon the existence of debts against the corporation which has gone into liquidation, for the payment of his subscription is necessary for the equalization of all the stockholders in the distribution of the assets.   (*Post, pp.* 530, 531.)

---

FROM SHELBY.

---

Appeal from the Chancery Court of Shelby County.— F. H. HEISKELL, Chancellor.

HENRY CRAFT, LIVINGSTON & MCGEHEE, and TIM E. COOPER, for petitioners.

W. A. PERCY and T. K. RIDDICK, for receiver.

---

*MR. SPECIAL JUSTICE HENDERSON delivered the opinion of the Court.

---

*Appointed and commissioned by the governor to sit during the disability of Mr. Justice Wilkes.

These two cases present the same questions, and by consent they were heard together upon the record in the former, with the slight addition to the latter noted in another connection.

On December 27, 1905, the board of directors of the Merchants' Trust Company filed the bill in the original cause against the Merchants' Trust Company and others, for the purpose of going into voluntary liquidation. John P. Edmondson was by the Chancellor appointed receiver of the assets of the company, and the creditors of the company were by proper order enjoined from prosecuting their claims against the company, except by proceedings in that case.

On May 7, 1906, E. B. Causey and Minnie C. McGehee filed their petition in the cause, alleging, in substance, as follows: The Merchants' Trust Company was organized as a banking institution by charter granted under the general incorporation laws of the State of Tennessee, with a capital stock of $200,000, all of which was subscribed and fully paid. At a meeting of the board of directors, held May 25, 1905, a resolution was adopted recommending to the stockholders an increase of the capital stock to $500,000, and that the new stock be sold at $120 per share, of which $100 should go to the capital stock of the company, and $20 to the surplus account, the present stockholders to have the option of subscribing to the new stock to the extent of their present holdings, and subscriptions are invited to the remain-

der, and the president is directed to call a meeting of the stockholders to be held June 20, 1905.

This meeting was accordingly held, and the following resolutions adopted by the stockholders:

. "Resolved, that the capital stock of the Merchants' Trust Company be increased to $500,000.

"Resolved, that said new stock be sold at $120 per share, of which $100 shall go to the credit of the capital stock of the company, and $20 to the surplus account, and that all subscriptions to said new stock shall be due and payable July 1, 1905.

"Resolved, that the stockholders of record be allowed to subscribe to the new stock to the extent of their present holdings, and that subscriptions be invited to remainder of said stock. Any of the present stockholders who desire to avail themselves of their rights under this resolution shall notify the officers of the company, in writing, on or before June 27, 1905, of their intention to do so, and any stockholder who does not so notify the president by that date shall be deemed to have waived his privilege of taking any portion of the new stock. In the event of stock being oversubscribed, the officers shall have the right to reduce or reject any subscriptions they see fit."

In accordance with this resolution of the stockholders, the directors applied to the Secretary of State of Tennessee for an amendment to the charter of the company increasing its capital stock to $500,000. This application for the amendment is in regular form, signed by

all the members of the board of directors. It is acknowledged before the county court clerk of Shelby county by one of them, Felix T. Pope, and the signatures of the others are proven by him before the clerk. Certificates in regular form are attached by the clerk, the secretary of State, and the register of Shelby county, and the amendment was duly registered in the offices of the secretary of State and of the register.

Petitioner E. B. Causey took fifty shares of the increased stock, executing to the company his note for $6,000, due at six months from July 1, 1905. As collateral security for this note, the company held his certificate of stock for $5000. Before the maturity of the note the bill in the original case was filed, and the receiver was appointed. The note not being paid, the receiver advertised it for sale, with other assets of the company, on May 7, 1906.

Petitioner Minnie C. McGehee took ten shares of the increased stock, paying therefor $600, and executed her note to the company for the remainder, $600, due at six months from July 1, 1905, and also deposited with the company her certificate of stock as collateral to secure its payment. Her note and collateral were also advertised by the receiver to be sold; she having failed to pay at maturity.

The petitioners in the second case (No. 52), 14 in number, had subscribed for various amounts of the increased stock, from 1 to 63 shares, the whole aggregat-

ing 374 shares, and they had all paid their subscriptions in full and taken certificates of stock.

The petitioners in both cases were about the time advised and informed of the action of the board of directors and stockholders above set out, and upon notice thereof they made their subscriptions. About July 7, 1905, they each received a notice from the president of the company, of which the following is a copy:

Felix T. Pope,          Robert L. Brown,          Wm. H. Kyle,
     President.               Vice Pres't               Cashier.

MERCHANTS' TRUST COMPANY.

Capital Stock, $200,000.

Memphis, Tenn., ———.

I, the undersigned, hereby subscribe for ——— shares of the capital stock of the Merchants' Trust Company, of the par value of one hundred dollars, each, and agree to pay for said shares at the rate of $120 per share. This subscription, however, is subject to the action of the stockholders of said company at a meeting to be held June 20, 1905, for the purpose of voting upon the proposition of increasing the capital stock to $500,000.

[Signed]  ———————.

From what is above stated, it is alleged that petitioners believed that all of the $300,000 of increased stock had been subscribed, and that the plan of the company had been fully carried out, and upon this belief and understanding they paid the cash and executed the notes as above stated.

It is further alleged that at this time only about $200,-000 of the $300,000 of increased stock had been subscribed; that approximately five hundred shares of this increased stock had by some sort of arrangement, the details of which were unknown to petitioners, been exchanged by the company for an equal number of shares of stock in two other banking institutions at Memphis, thus leaving about one hundred and fifty shares of the increased stock not subscribed by any one, and that these 150 shares have never yet been taken.

Under these circumstances it is contended by petitioners, the whole authorized increase of stock not having been subscribed, that the increased stock was never ready for issuance, and should not have been issued, and that which was issued was void.

It is further contended that the increased stock of the company was never validly provided for, because of the irregularity in the acknowledgment of the application, which was made to the secretary of State by way of amendment to its charter, providing for said increase; that the acknowledgment of the same by one of the applicants, Felix T. Pope, and the proving by him of the signatures of the other applicants, was not a compliance with the law on the subject, he not being a competent witness.

It is contended by those of the petitioners who have paid the cash for their stock that it was paid upon a void contract, and, having received no consideration therefor, that they are entitled to recover the money

back from the company, with interest; and the petition is filed also on behalf of all subscribers who had paid.

The prayer of the petition is for an order directing the receiver in the original case to refrain from selling the stock and notes of petitioners, E. B. Causey and Minnie C. McGehee; that, after proper reference and ascertainment of the facts by the court, an order be made upon the receiver to hold as a separate and distinct fund the amount that may be necessary to pay what may be found to be due petitioners in full, or *pro rata*, as the assets of the company may develop to be, and to this end that all moneys paid into the Merchants' Trust Company by subscribers to the increased stock be treated and declared a trust fund for their benefit, and that they have priority in said fund to the subscribers of the original stock of $200,000; and that the notes executed by petitioners for the increased stock be canceled and delivered up.

It appears from agreement of counsel that all the creditors of the company, outside of petitioners, have been paid in full.

John P. Edmondson, the receiver, demurred to the petition on substantially the following grounds, as shown by the records in the two cases:

First. Petitioners cannot in this proceeding complain of any irregularity in the application of the directors of the company for the amendment of the charter referred to.

Second. While there may be cases in which a corporation has never lawfully commenced business, where subscribers to its stock can complain if the corporation begins to do business before all the stock is subscribed, that principle does not apply to cases like that of the Merchants' Trust Company. As shown in the petition, the original issue of stock authorized by the Merchants' Trust Company was all subscribed in full, and said trust company lawfully and properly was open for business. Having once become such a corporation, the principle above referred to does not apply to subsequent issues of stock, and the subscribers or purchasers of such stock cannot successfully plead that the entire increase authorized was not subscribed.

In the case of such subsequent issues, the acquirement thereof is rather a purchase than a subscription, and each transaction is complete in itself.

Third. Even if petitioners had the right to complain originally (which is denied), yet each of them has waived this right by accepting the stock and giving notes for the amounts due thereon.

The chancellor sustained the demurrer, and petitioners have appealed and assigned the following errors:

"(1) The court erred in sustaining the demurrer and dismissing the petition.

"(2) The court erred in holding that said amendment to the charter was properly executed, and that Felix T. Pope, one of the parties to the instrument, was a

competent subscribing witness to the signatures of the other parties thereto.

"(3)   The court erred in holding petitioners bound upon their contracts of subscription, when said company had violated its agreement to sell all of said stock at a premium of $20 per share, and thus create a surplus of $60,000 in said bank.

"(4)   The court erred in holding petitioners upon their subscriptions, when it appeared that the whole of said stock had not been subscribed for.

"(5)   The court erred in holding petitioners subject to call upon their subscriptions, when it appeared that said institution was in the hands of a receiver, and that it was not necessary to call upon the stockholders for the payment of creditors; all creditors having been paid in full.

"(6)   The court erred in dismissing the petition altogether and granting no relief therein. In any event, the sale of petitioners' stock should have been enjoined until the court finally ascertained the exact amounts for which petitioners were liable in liquidating the affairs of the bank."

The main questions in the case are with regard to the validity of the amendment to the charter and with regard to the rights of the subscribers to the increased capital stock; the whole of that increase provided for not having been taken or subscribed.

All the proceedings in the procurement of this amendment are conceded to have been regular, except it is con-

tended by petitioners that proof by Felix T. Pope, one of the applicants, of the signatures of the other applicants was insufficient; it being claimed that he was incompetent as a witness for this purpose.

Shannon's Code, section 2542, provides: "The signatures of said five or more corporators must be acknowledged, or one or more signatures proved by one witness before the clerk of the county court," etc.

Nothing is said about the qualifications of this witness. Interest in the charter applied for does not disqualify him any more in this than in any other case. The witness contemplated by this act is any one who would be competent to testify in a court of justice about the matter involved.

To authenticate an instrument for registration it is provided by statute that its execution shall be acknowledged by the maker or proved by two subscribing witnesses. Shannon's Code, section 3712.

In *Bank* v. *O'Brien*, 94 Tenn., 38, 28 S. W., 293, it is held that the wife is not a competent subscribing witness to her husband's deed, because Acts 1879, p. 243, c. 200, and other acts on the subject, do not extend her competency to a matter of this sort; the court saying that the act has no reference to subscribing witnesses to either deeds or wills, and that the probate of deeds or wills is not in the purview of the law, and clearly was not in the legislative mind.

Whether Pope is a competent witness or not, the question cannot be made in this case, under Shannon's Code,

sections 2031, 2064, the latter of which is as follows: "No body of men acting as a corporation under the provisions of this chapter shall be permitted to set up the want of a legal organization as a defense to an action against them as a corporation; nor shall any person sued on a contract made with such corporation, or sued for an injury to its property, or a wrong done to its interests, be permitted to set up a want of such legal organization in his defense."

*Railroad* v. *Sneed,* 99 Tenn., 1, 41 S. W., 364, 47 S. W., 89, is cited by appellants. In that case the subscribers were relieved from their subscriptions to the increase capital stock of the railroad company; but the amendment to the charter was not taken out as provided by the statute. The increase was attempted to be made upon mere resolution of the board of directors; and it was held to be void.

The assignments of error with regard to the manner of the execution of the charter are overruled.

It is next insisted that under the allegations of the bill there was an express contract between petitioners and the company that all of the increased stock should be subscribed at the rate of $120 per share, and that petitioners' subscriptions were based upon that condition; and without this express contract the law implies a contract that all of said stock shall be subscribed before any valid call upon subscribers could be made.

The bill does not allege any express contract on the subject. Its meaning is that from the facts alleged, and

which are substantially set out above, the law implies such a contract.

There was subscribed of this increased stock approximately $235,000 of the $300,000. In addition to this, $50,000 of the stock was exchanged for stock in another bank in Memphis. This latter is alleged to be worth less than par, and that the exchange was an illegal transaction on the part of the Merchants' Trust Company, thus leaving undisposed of $65,000 of the increased stock; or, if that transaction be held to be valid, there will be $15,000 of the increased stock not taken or subscribed.

We restate briefly some of the main facts:

The subscribers to the increased stock were duly notified of the action of the board of directors in making the recommendation to the stockholders of the proposed increase, a meeting of whom was called for June 20, 1905. This meeting of the stockholders was accordingly held, when it was resolved that the capital stock of the Merchants' Trust Company be increased to $500,000, the new stock to be sold at $120 per share, of which $100 should go to the credit of the capital stock of the company, and $20 to the surplus account, "and that all subscriptions to said new stock shall be due and payable July 1, 1905."

The subscriptions were made by petitioners prior to the meeting of the stockholders, subject to the action of the latter at the meeting when held on June 20, 1905.

Upon notice by the president of the company, all the

petitioners paid their subscriptions in full and received their certificates of stock, except E. B. Causey, who gave his note to the company for the full amount of his, and Minnie C. McGehee, who paid fifty per cent of hers, giving her note to the company for the remainder; the certificates of each of them being issued by the company and held as collateral security for the payment of their notes.

Prior to this time the Merchants' Trust Company was a going corporation, with its authorized capital stock of $200,000 fully paid up.

By resolution of the stockholders passed at the meeting June 20, 1905, this increased stock was to be sold, and only ten days, to July 1, 1905, were allowed within which to pay the whole. The petitioners were fully informed of this, and there was no promise on the part of the company that the payment was conditional on the whole increase being sold or subscribed.

The general principle is settled by the authorities that a subscription to the original stock of a corporation is made upon the condition that the whole amount of the capital stock is taken by *bona fide* subscribers, and the subscribers will not be compelled to pay until this is done.

The same rule does not apply to increased issues of stock. There is some conflict, or apparent conflict, in the authorities on this subject; but the unquestioned weight of authority is in favor of this distinction. The reason of the rule is that a corporation should not begin

business until the requisite amount of its capital stock is secured by *bona fide* subscriptions. After it has begun business and is in operation, a going concern, the same reason does not apply; for the subscriber gets what he contracts for, receives what he pays for, to wit, stock in a corporation already legally constituted.

In Morawetz on Corporations, section 142, it is said:

"If a corporation is authorized by its charter to increase the amount of its capital stock, and an increase is voted, a subscriber for new shares will be liable to pay calls without regard to the amount of the new shares that have been taken. The reason of this is obvious. The corporation, having already begun business, would be entitled to continue its business, whether the whole or only a part of the new issue should be taken, and a subscriber would become a shareholder in a going concern immediately. The contribution of the new capital would, therefore, be required for the company's authorized business purposes."

In Beach on Corporations, section 597, it is said:

"The takers of the new stock cannot avoid liability by pleading that the whole amount of the increase had not been subscribed for, as one may do in case of a subscription to the original stock."

In Cook on Stock and Stockholders, section 288, it is said:

"A person subscribing for shares of stock upon an increase of the capital stock is liable thereon, the same as a subscriber to the original capital stock. In some re-

spects he cannot set up defenses that an original subscriber might set up. Thus, a subscriber for increased stock cannot defeat an action to enforce his subscription by setting up the failure of the corporation to obtain subscriptions for the whole of the authorized increase."

In 2 Thompson on Corporations, section 2102, it is said:

"When an increase of stock by a mining company has been determined in the manner provided by the statute, and the stockholders decline to pay for part of the stock, the authority of the company to dispose of such stock is complete, and the agreement to take shares may be enforced by action, although the whole of the increased stock is never taken."

"A subscriber for increased stock cannot defend an action to enforce his subscription by setting up the failure of the corporation to obtain subscriptions for the whole of the authorized increase." 26 A. & E. Enc. Law (2d Ed.), p. 936, citing *Delano* v. *Butler*, 118 U. S., 634, 7 Sup. Ct., 39, 30 L. Ed., 260, and *Greenbrier Industrial Exposition* v. *Ocheltree*, 44 W. Va., 627, 30 S. E., 78.

The case of *Read* v. *Memphis Gayoso Gas Co.*, 9 Heisk., 546, is cited as an authority that there is no distinction regarding the rules of law which apply to the construction of contracts of subscription to original stock and increased stock.

In that case the gas company sued Read for a call upon his subscription to the capital stock of the company. The authorized capital stock of the company was by its

charter fixed at $25,000, which it is provided may be increased from time to time to $300,000. As soon as $25,-000 shall be subscribed the incorporators are authorized to hold an election for directors and to organize the company. Read subscribed $1,000 of this stock, which made the amount then subscribed $25,500, after which, and before the election of directors, $5,000 additional was subscribed. No calls were made for payment of stock prior to December 12, 1866, when the board of directors, under authority of an amendment of their charter previously made by the legislature authorizing an increase of the capital stock to $1,000,000, passed a resolution requesting the president and secretary to open the books of subscriptions to the amount of $600,000, the books to be kept open for thirty days, and then closed, at which time the subscribers would be required to pay ten per cent of their subscriptions, and the balance as may be called for by the board of directors.

During the thirty days, the subscriptions amounted to $150,000, when the books were closed. The suit in the case was for two assessments of ten per cent each. It was insisted by Read that he was not liable to pay this, because although his subscription made up the full amount of $25,000, which authorized the company to begin business, yet before the assessments the directors had fixed the amount of the capital stock at $600,000. and no legal assessments for general purposes of the corporation could be made until the amount so fixed had been *bona fide* subscribed.

Read was a subscriber to the original $25,000 of stock. Even though, before his subscription was called for or paid, the amount of the stock was increased, he was liable for his subscription under the terms of the charter, whether any amount in addition to the $25,000 had been subscribed or not. In this connection, the court says, through Nicholson, C. J.:

"But such increase in the capital stock could work no change in the rights or liabilities of the original subscribers, for the reason that the corporation continues to be the same entity, and for the further reason that it was part of the contract of the original subscribers that the directors should have the power to increase the capital stock."

Upon these facts Read was held liable for his subscription. In discussing the principles on the subject, it is said by the court (page 556):

"The general principle which governs the case is thus laid down in 1 Redf. on Railways, 175: 'It is an essential condition to making calls in those companies where the number of shares and the amount of capital is fixed that the whole stock shall be subscribed before any calls can be lawfully made.' This position is supported by the numerous cases cited in the note with which we have been furnished by counsel, as well as by other cases. This principle applies alike to cases in which the charter of incorporation has fixed the amount of capital and number of shares, and to those in which the charter authorizes the companies, when organized under fixed

capitals, to increase their capitals.   When so increased, the amounts fixed become the capitals, which must be subscribed before legal assessments can be made.   The cases of *Nutter* v. *West Cambridge R. R. Co.*, 6 Gray (Mass.), 87, and *York & Cumberland Railway* v. *Pratt*, 40 Me., 447, strongly illustrate and support the general principle in its application to the facts of the case before us."

In *Nutter v. West Cambridge Co.*, 6 Gray (Mass.), 87 here referred to, the general principle is stated that subscribers to original stock in corporations are not always considered as having assumed absolute and unconditional obligations.   It is said that as a general rule they are not bound to pay unless the whole amount of the capital stock has been first determined and subscribed.   In that case the original stock had all been taken, and the corporation was in operation, when an increase of stock was provided for, which was sold to new subscribers, as in this case.   Gould had purchased the entire amount of this increased stock, for which he paid, and afterwards sold his claim to the plaintiff, who brought suit to recover the money back from the company.

The court, after referring to certain cases upon the subject of original stock, says:

"But the transaction between Gould and the defendants was of a different character and does not come within the principle of any of these cases.   In relation to the four shares which Gould contracted to take, or

to purchase—however the transaction may be described—when he paid the money now sought to be recovered and gave his promissory note for the balance, he was an original purchaser for stock. Such subscriptions had been received by the defendant at an earlier period, and with the funds derived from the stock so disposed of they had proceeded to construct their road and execute the general purposes of the corporation. But in June, 1847, their funds were exhausted, and they were compelled to find additional means with which to complete their work. In this condition of things, the directors voted to issue and dispose of six hundred new shares of the capital stock at $70 a share, giving to those persons who were then stockholders a right to take one of the new for every two of the old shares of which they should be the proprietors on the 10th of the ensuing month of September. This imposed upon the stockholders no obligation whatever. They were as free to decline as they were to take any of the new shares. It was a privilege which they might waive or avail themselves of at their pleasure. If the stockholders should not, within the time limited for them to make their election, take the new shares, by a necessary implication the shares were then to be offered to the public at large. And no one could tell, until it had been tested by an actual trial, whether the project would succeed or fail. Every one, from the first to the purchaser of the last remaining unsold share, took upon himself, to the extent of his own contract, the hazard of a disposition of the

whole of the shares to be newly created. But every one who paid and received a certificate for the shares paid for obtained all the corporation contracted to transfer to him."

It is further said in *Read* v. *Gayoso Gas Co.*, supra, that it is manifest the true interpretation of the resolution of the board of directors is that it was intended to fix $600,000 as the capital stock, if that amount should be subscribed within thirty days; if not, then the capital stock should consist of such amount as may be subscribed within that time, for the time being, and the subscribers would be required to pay, whether the whole be subscribed or not.

In the case before the court, by resolution of the board of directors adopted June 20, 1905, the increase of stock is directed to be sold, and paid for in full at the end of ten days thereafter, July 1, 1905. The stock was purchased by petitioners, and subscribed or paid for with full knowledge of what had been done; and the manifest intention of the parties was that payment therefor was not dependent on the condition that the whole stock should be taken.

The case of *Railroad* v. *Sneed*, 99 Tenn., 7, 41 S. W., 364, 47 S. W., 89, is relied on by petitioners. There the railroad corporation was organized April, 1886, under the general incorporation laws of 1875; its capital stock being fixed at $27,000, all of which was subscribed. In January, 1890, the directors of the corporation passed a resolution increasing the stock to $60,000, and on

March 31, 1891, they passed another resolution attempting to make another increase to $100,000. Sneed subscribed for stock after the increase from $27,000 to $60,-000, and the bill is filed by the corporation to collect his subscription.

The increase in both instances was attempted to be made alone by resolution of the board of directors. This is held to be void, because, under chapter 163, p. 212, of the Acts of 1883, the increase could be made only by an amendment to the charter, procured upon formal application to the State. The amendment must be probated and registered, and its registration certified by the secretary of state, etc,; provisions similar to those required upon the original incorporation. This was not done, and the proposed increase of stock was held to be void.

The court says, speaking through Mr. Justice Wilkes:

"The result is that the increased stock was illegal and void, and the subscriber to the increase stands, not in the attitude of a stockholder, but in that of a creditor, having advanced money upon a void contract, and, having received no consideration therefor, is entitled to recover the same back. 3 Thompson on Corporations, section 3691; *Schierenberg* v. *Stephens,* 32 Mo. App., 314; *Nichols* v. *Stephens,* 32 Mo. App., 330; *Winters* v. *Armstrong* (C. C.), 37 Fed., 508. In the latter case Judge Howell E. Jackson says: 'Such a subscription is impliedly conditioned on the subscription of the whole amount of the proposed increase, and on the compli-

ance by the corporation with all the requirements of the statute necessary to make the increased stock valid, and in case of noncompliance with such requirements there is a failure of consideration.'"

In the case of *Winters* v. *Armstrong*, here referred to, the Fidelity National Bank of Cincinnati was organized in February, 1886, with a capital stock of $1,-000,000, which its articles of association provided might be increased according to the provisions of section 5142, Rev. St. [U. S. Comp. St. 1901, p. 3462], to any sum not exceeding $3,000,000. This section provides for an increase of capital, but the maximum shall be determined by the comptroller of the currency, "and no increase of capital shall be valid until the whole amount of such increase is paid in, and notice thereof has been transmitted to the comptroller of the currency, and his certificate obtained, specifying the amount of such increase of capital stock, with his approval thereof, and that it has been duly paid in as part of the capital of such association."

By act of congress approved May 1, 1886 (24 Stat. 18, c. 73), it is provided that increase of the capital stock of any national banking association shall be made only with the approval of the comptroller of the currency, by a vote of two-thirds of its stockholders.

It will be noted that the act of congress provides that no increase in capital stock shall be made, except with the approval of the comptroller of the currency. The whole of such increase must be paid in, and certificate

of approval received from him; and, preliminary to this, the increase must be authorized by a vote of two-thirds of the stockholders. In that case the directors of the Fidelity National Bank, in March, 1887, passed the reso-lution that the capital stock of the bank be increased $1,000,000. No proper steps were taken by the bank to perfect the proposed increase of stock in conformity with the provisions of the laws applicable to such cases.

Citing *Railway Co.* v. *Allerton,* 18 Wall. (U. S.), 233, 21 L. Ed., 902, Judge Jackson says: "Corporations have no power to increase or diminish their stock, unless expressly authorized so to do. It is also well settled that the directors of the corporation cannot, in the absence of power expressly conferred, make any valid increase of its capital stock."

With the increase attempted to be made in *Winters* v. *Armstrong,* as above stated, the subscriptions in ques-tion in that case were taken, and the subscribers resisted payment upon the grounds that the law providing for the increase had not been complied with, as a conse-quence of which their subscription was void. This con-tention was sustained by the court, and this is a direct authority for our own case of *Railroad* v. *Sneed,* supra. And the language of Judge Jackson, there quoted by Mr. Justice Wilkes, holds the subscription void because the corporation had not complied, in attempting to make the increase, with the requirements of the statute on the subject. Such is the extent of the holding of this court in *Railroad* v. *Sneed.*

118 Tenn—34

To give emphasis to what we say, we quote further from *Winters* v. *Armstrong*:

"New subscribers to the capital stock of national banks, whether at their original organization or subsequently, upon a contemplated increase of their capital stock, clearly enter into an agreement or understanding based upon the charter powers of such associations; and the rights and obligations of such subscribers rest and must be determined upon the conditions and law of the charter, as evidenced in the banking legislation of congress. Whatever conditions are imposed by the law upon said associations as a prerequisite or condition precedent to the acquisition of the power and authority necessary to the issuance or creation of valid stock must be performed before the subscription can be enforced, either on behalf of the association or of those claiming through or under it."

The case of *Anderson* v. *Railroad,* 91 Tenn., 44, 17 S. W., 803, is not authority for the contention of petitioners. This was a case of subscription to the original stock of the corporation, when the whole stock had not been subscribed. Some of the subscribers were relieved from their subscriptions, and others not; the latter because of certain acts of theirs, whereby they were held to have impliedly waived their right to have the whole stock taken before their liability attached.

The fifth assignment of error relates alone to the petitioners Causey and McGehee, who have not paid their subscriptions; all the other petitioners having paid in

full.    They all stand upon the same footing.    The fact that some have not paid, places them in no better condition than those who have.

Many other authorities are cited and discussed in the exceptionally able brief of counsel for petitioners.

The conclusion we have reached is in entire accord with our own cases, and is sustained by the great weight of authority.

It is urged that the rights of creditors of the Merchants' Trust Company are not involved in this case, as they have all been paid.    But, from the view we take of the case, the liability of the subscriber for his subscription is not dependent upon the existence of debts against the corporation.    The holders of the new stock have equal rights and stand upon the same footing as do the holders of the original stock; and it is necessary, therefore, that the subscriptions of the new stock shall be fully paid, as it is for the original stock.    Both constitute assets of the corporation for the benefit of all the stockholders alike.

It results that there is no error in the decree of the chancellor, and it is affirmed.